## Case No. 7,501.

### JONES v. VANZANDT.

[2 McLean, 596; [1] 1 West. Law J. 2.]

Circuit Court, D. Ohio. July Term, 1843.

[1] [Reported by Hon. John McLean, Circuit Justice.]

Fox. Southgate & Morris, for plaintiff.
Mr. Chase, T. Morris, and Mr. Jolliffe, for defendant.

McLEAN, Circuit Justice. It is proper, first, to ascertain the precise character of the motion. By some of the counsel, in the argument, it has been treated as a demurrer to the evidence; but it can not be so considered. No demurrer has been filed, and should the motion be overruled the defendant intends to examine witnesses. A demurrer to the evidence takes the case from the jury; the facts proved are admitted to be true, and, also, every legal inference that can be drawn from them favorable to the plaintiff. The motion is not, technically, for a nonsuit. Such a motion would not be granted by the court, where there was evidence conducing to sustain the right of the plaintiff. The motion must then be considered as asking the court to overrule the evidence, on account of its irrelevancy or incompetency. Now, such a motion is never granted where the evidence is competent, and it conduces to establish the case made in the declaration. The jury are the proper judges of the sufficiency of the testimony. The range of discussion by the counsel on both sides, has not been restricted by the court. It has embraced slavery in all its forms and consequences—the federal constitution, the act of congress, and the power of the states. It may be proper to notice some of the topics thus discussed, which have a bearing upon the case under consideration. The nature of the action has been examined. It must be admitted that it arises wholly under the constitution and act of congress. Slavery is local in its character. It depends upon the municipal law of the state where it is established. And if a person held in slavery go beyond the jurisdiction where he is so held, and into another sovereignty where slavery is not tolerated, he becomes free. And this would be the law of these states, had the constitution of the United States adopted no regulation upon the subject. Recaption has been named as a common law remedy. But this remedy could not be pursued beyond the sovereignty where slavery exists, and into another jurisdiction which had entered into no compact to surrender the fugitives. There is no general principle in the law of nations, which would require a surrender in such a case. The remarks of the supreme court, in regard to a surrender of captured slaves in the Amistad Case, were made with reference to our treaty with Spain. In our colonial governments, and under the confederation, no general provision existed for the surrender of slaves. From our earliest history it appears that slavery existed in all the colonies, and at the adoption of the federal constitution it was tolerated in most of the states. The constitution treats of slaves as persons. The view of Mr. Madison, who "thought it wrong to admit in the constitution, the idea that there could be property in men," seems to have been carried out in that most important instrument. Whether slaves are referred to in it, as the basis of representation, as migrating, or being imported, or as fugitives from labor, they are spoken of as persons. Property, real or personal, takes its designation and character from the laws of the states. It was not the object of the federal government to regulate property. A federal government was organized by conferring on it certain delegated powers, and by imposing certain restrictions on the states. Among these restrictions it is provided that no state shall impair the obligation of a contract, nor liberate a person who is held to labor in another state from which he escaped. In this form the constitution protects contracts, and the right of the master, but it originates neither.

The traffic in slaves does not come under the constitutional power of congress to regu-

late commerce among the several states. In this view the constitution does not consider slaves as merchandise. This was held in the case of Groves v. Slaughter, 15 Pet. [40 U. S. 449]. The constitution nowhere speaks of slaves as property. But how does this affect the case under consideration? It is clear the plaintiff has no common law right of action for the injury complained of. He must look exclusively to the constitution and act of congress for redress. The counsel for the defendant admit that, in a given case, the plaintiff has a remedy under the act of congress. If this be so, what have we to do with slavery in the abstract? It is admitted, by almost all who have examined the subject, to be founded in wrong, in oppression, in power against right. But in this case we have only to inquire whether the acts of the defendant, as proved under the law of congress, subject him to a claim for indemnity by the plaintiff. By the third section of the act respecting fugitives from labor, it is provided, "that when a person, held to labor in any of the United States, &c., under the laws thereof, shall escape into any other of the said states, the person to whom such labor is due, his agent, or attorney, may seize or arrest any such fugitive," &c. [1 Stat. 302]. And the fourth section provides "that when any person shall knowingly and willingly obstruct or hinder such claimant, his agent or attorney, in so seizing or arresting such fugitives from labor, &c., or shall harbor or conceal such persons, after notice that he or she was a fugitive from labor as aforesaid, shall, for either of the said offences, forfeit and pay the sum of five hundred dollars, &c., saving, moreover, to the person claiming such labor or service, his right of action for, or on account of, the said injuries, or either of them." As the first clause in the above section supposes the offender to come in contact with the claimant of the fugitives, his agent or attorney, and as there is no evidence showing an authority from the claimant to those who arrested the fugitives, the second clause, only, of the section will be examined. The offence under this clause consists in harboring or concealing such fugitive, after notice that he or she had escaped from labor. What acts shall constitute this offence? What shall be a notice under the statute? That a formal written notice from the claimant, his agent or attorney, is not required, must be admitted. Nor must the notice, verbal or otherwise, necessarily come from the claimant or his agent. Such a construction presupposes a knowledge, by the complainant, of the individual who harbors or conceals the fugitives. At this stage of the case it is unnecessary to say more on this point than that there is evidence before the jury which conduces to show that the defendant knew the negroes in question were fugitives from labor. Whether the proof is sufficient to establish this fact is a matter for the determination of the jury. To harbor or conceal a fugitive, in violation of the statute, the act must evince an intention to elude the vigilance of the master or his agents; and the act done must be calculated to attain this object. To relieve the hunger of a fugitive would not be within the statute, unless accompanied by acts showing a determination to disregard the law. There is evidence in the case conducing to show an intention to do this by the defendant, and also to show acts calculated to give effect to such an intention. The sufficiency of this evidence, like that which regards the notice, will be referred to the jury. The clause in the section, "saving to the claimant the right of action for the injuries received, beyond the penalty, presupposes a right of action to exist." The correctness of this will scarcely be questioned, when the constitutional provision on the subject is considered. On this motion the question of damages need not be considered, nor the alledged defects in the declaration. These points may be considered in the future progress of the case. The court overruled the motion.

An unsuccessful effort was made by calling witnesses to impeach the credibility of some of the plaintiff's witnesses.

[The cause was then argued to the jury on the facts by the same counsel, who insisted on and controverted before the court the same legal positions as on the motion to overrule. In behalf of the defendant the court was asked to give those legal positions except the fourth, fifth, and sixth, in charge to the jury, and also to charge: (1) That fraudulent concealment was necessary to constitute the offense of harboring or concealing under the statute. (2) That the concealment must be actual, the person concealed being kept out of view and sheltered from observation. (3) That no damages could be recovered from the loss of any person not thus actually concealed. (4) That no reward paid under a statute of another state, for acts done in violation of the criminal law of Ohio, could form an item of damages. (5) That unless the injuries complained of, namely, the loss of services and the expenses of recaption, were the consequences of acts done by the defendant, he could not be held liable. (6) That obstruction, to the seizure or arrest of fugitives from labor within the description of the act of congress by persons having no actual authority from the claimant to make such seizure, was no offense under the act, although the acts of such persons' were subsequently approved by the claimant.][3]

McLEAN, Circuit Justice (charging jury). The attention and patience with which you have heard this case, gentlemen of the jury, show that you appreciate its importance;

---

[3] [From 1 West. Law J. 2.]

and I doubt not that, in deciding it, you will follow the dictates of an unbiassed judgment. (Here the judge restated the evidence, which may be omitted, as it is stated above.) The plaintiff does not seek redress for the injuries complained of on any general principle, legal or equitable, of the common law. He relies on the constitution, and the act of congress [1 Stat. 302], as the foundation of his right. The second section of the fourth article of the constitution, declares that "no person held to service or labor in one state. under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up, on claim of the party to whom such service or labor may be due." And the third and fourth sections of the act of congress, of the 12th February, 1793, as above cited, define more particularly the rights of the master, and provide for him modes of redress. The seventh and eighth counts, which were in trover, have been abandoned. These counts state that the slaves were casually lost, in Boone county, Kentucky, by the plaintiff, and that they came into the possession of the defendant, a citizen of Ohio. Now, if the slaves left the service of the plaintiff with his consent, or in any other mode, except as fugitives from labor, and came into the possession of the defendant, as alledged, the plaintiff has no right to their services, and still less, to recover from the defendant their value. The sixth count, which charges the defendant with having rescued the slaves after they were seized by the agents of the plaintiff, has also been abandoned. There is no evidence which tends, in any degree, to show a rescue. The fifth count charges the defendant, under the first clause of the fourth section of the act, that he knowingly and willingly obstructed, and hindered the agents of the plaintiff, in seizing or arresting the fugitives. That the defendant resisted, to the utmost of his power, the arrest of the negroes, by Hefferman and Hargrave, is undoubted. But, in this, did the defendant violate the law? The persons who made the seizure had no authority from the plaintiff. And it is the obstruction or hindrance to the arrest, by the claimant, his agent or attorney, that incurs the penalty under the above clause of the statute, and also subjects the party to damages for the injury. The resistance, then, of the defendant to the arrest, by Hefferman and Hargrave was, in no sense, a violation of the statute. They acted without authority, and had no legal right, therefore, to make the arrest. But it seems, from the evidence, that the plaintiff, when the negroes were returned, ratified the acts of Hefferman and Hargrave, in making the arrest. And here the question arises, whether a subsequent ratification can legalize the arrest. That the subsequent ratification legalizes the original transaction, is a general principle in agencies. And, in this case, it is unquestionably good, as between the plaintiff and his agents. But the inquiry is, whether such subsequent ratification can have relation back, so as to affect the acts of the defendant. Can it so change the nature of the defendant's acts as to subject him to a penalty, which was not incurred prior to such ratification. Most clearly it can not. The statute under consideration is a penal one, and, consequently, must be construed strictly. It is not within the legislative power to make an act penal which was not so when it was done. Much less can such an effect result from the ratification, by the plaintiff, in the present case. We must look to the other counts in the declaration, which charge the defendant with harboring and concealing the negroes, after he had notice that they were fugitives from labor. If the evidence shall not sustain these counts, the plaintiff can not recover. The plaintiff is bound to show that the defendant harbored or concealed the negroes, after he had notice that they were fugitives from labor. And, first, as to the fact of notice.

In Kentucky, and every other state where slavery is sanctioned, every colored person is presumed to be a slave. This presumption arises from the nature of their institutions, and from the fact that, with few exceptions, all the colored persons within those states are slaves. On the same principle, every person in Ohio, or any other free state, without regard to color, is presumed to be free. No presumption, therefore, arises, from the color of these fugitives, alone, that the defendant had notice that they were slaves. A notice in writing to the defendant was not necessary, nor any special notice from the plaintiff, his agent or attorney. But if, at the time the defendant was connected with these negroes, he had a full knowledge of the fact, however acquired, that they were slaves, and fugitives from labor, it is enough to charge him with notice. You must satisfy yourselves on this point by an examination of the evidence. The fact must be clearly proved, and, if it be so proved, it would be a reproach to the law, and to the administration of justice, to hold that the notice was insufficient. What shall constitute a harboring or concealing within the statute? This offence is not committed, in my judgment, by treating the fugitive on the ordinary principles of humanity. You may converse with him, relieve his hunger and thirst, without violating the law. In short, you may do any act which does not show an intent to defeat the claims of the master. But any overt act which shall be so marked in its character, as not only to show an intention to elude the vigilance of the master, but is calculated to attain such an object, is a harboring of the fugitive in violation of the statute. It is clearly within the mischief it was designed to prevent. To constitute the offence under the statute, it is not necessary to incarcerate the fugitive in a dungeon or room: if he be-

taken in a wagon and conveyed from the shore of the Ohio to the shore of Lake Erie which enables him to escape into Canada, I suppose no one could doubt that the individual had made himself responsible. And if carrying the fugitive the whole of this route would incur the penalty, on the same principle the conveyance of him such a part of the route as shall cause the loss of his services to the master would equally incur liability. The damages claimed by the plaintiff consist of the sum of four hundred and fifty dollars paid as a reward to Hefferman and Hargrave, and other expenses, amounting in the whole to about six hundred dollars. And, also, he claims the value of the services of Andrew, who had been lost to the plaintiff. Those services are estimated by the witnesses to be worth six hundred dollars. It is said that this sum could have been realized by the plaintiff for the boy. Under the statute you will observe that a penalty of five hundred dollars is incurred for harboring or concealing a fugitive, which the party injured may recover, but the present action is not for this penalty. In this suit the plaintiff is only entitled to recover the damages he has actually sustained by the acts of the defendant. You will first determine whether the proof under the principles here laid down entitle the plaintiff to recover. And if he be so entitled then you will consider the amount of the damages.

It is earnestly contended by the defendant's counsel, that as Hargrave and Hefferman were kidnappers and violators of the law of the state in arresting the negroes; that they were entitled to no reward, and that the payment of it by the plaintiff does not entitle him to remuneration. The principle is recognized that the commission of a crime or an agreement to commit an unlawful act, does not constitute a good consideration for a contract. Any contract is void that rests upon such a basis. But this principle does not apply to the point under consideration. It may be admitted that Hefferman and Hargrave were trespassers, if nothing more, in seizing the wagon of the defendant; but the inquiry is, whether, by the laws of Kentucky, the plaintiff was not bound to pay to Hefferman and Hargrave, for the return of the fugitives. There is no doubt of this, as the law of Kentucky is explicit on the subject. If then the plaintiff, by the law of Kentucky, was obliged to pay the sum, and if such obligation resulted from the acts of the defendant, it would seem that the plaintiff may claim indemnity for such an injury. In this incidental mode we cannot try the guilt or innocence of Hargrave and Hefferman. We can only judge of the acts of the defendant, and to what extent he injured the plaintiff. Unless you should be clearly satisfied, gentlemen, that the defendant, after notice that the negroes were fugitives from labor, did harbor or conceal them within the statute, you will

find for the defendant. But if you shall find that the defendant has violated the law, then you will find for the plaintiff the damages he has suffered from such violation of the law and of his rights by the defendant. To authorize such a verdict, you must believe that, by the acts of the defendant, the plaintiff has been compelled to pay the reward stated, and the other expenses, and also that he has lost the services of the colored man, Andrew.

If the evidence showed that the defendant had taken the negroes from the farm of the plaintiff, in Kentucky, and conveyed them through Ohio until arrested, there would seem to be no doubt of the plaintiff's right to the damages he claims. But there is no proof that the defendant took the negroes from Kentucky. On the contrary it appears, by his own confession, that he received them at the Walnut Hills, near Cincinnati. Still if you shall consider the defendant is liable under the statute, and that the full amount of the injury complained of has been done to the plaintiff by the defendant, it will be your duty to find accordingly. Gentlemen, in the course of the argument much has been said of slavery in the abstract, of abolitionism, of associations with the view of promoting the abolition of slavery and of acts growing out of these exciting topics, which have no direct connection with the issues before you. Citizens, individually or collectively, have a right to express their opinions and to discuss any subject in which they may feel an interest. Unpopular and foolish as it would be for individuals to form association to alter the constitution of Ohio and annul the ordinance of 1787, so as to admit slavery into the state, yet I suppose no one would question their right to do so. And so long as they should confine themselves to topics of discussion, however erroneous, still they would be obnoxious to no legal penalty. But if they should attempt to subvert the law, by a clandestine introduction of slavery into the state, every good citizen would say they should suffer the penalties for such an offence. I know of no association whose avowed object is to subvert the law, unless it be one in a neighboring state, which I have noticed since the commencement of this trial, and which, it seems, pledges itself to oppose by force the execution of a certain law.

In the course of this discussion much has been said of the laws of nature, of conscience, and the rights of conscience. This monitor, under great excitement, may mislead, and always does mislead, when it urges any one to violate the law. Paul acted in all good conscience, when he consented to the death of the first martyr; and, also, when he bore letters to Damascus, authorizing him to bring bound to Jerusalem all who called upon the name of Jesus. I have read to you the constitution and the act of congress. These bear the impress of the nation. The principles which they lay down and enforce have been sanc-

tioned in the most solemn form known in our government. We are bound to sustain them. They form the only guides in the administration of justice in this case. I charge you, gentlemen, to guard yourselves against any improper influence. You are to know the parties only as litigants. With their former associations and views, disconnected with this controversy, you have nothing to do. It is your duty to follow the law, to act impartially and justly; and such, I doubt not, will be the result of your deliberations.

[The jury returned a verdict in favor of the plaintiff for twelve hundred dollars, which was entered, by direction of the plaintiff's counsel, as a verdict of guilty under the third and fourth counts of the declaration, which charged the defendant with harboring and concealing the fugitives after notice, thereby occasioning to the plaintiff the loss of their services for six days, and the expenses incident to the recaption. No verdict was entered on the other counts. Mr. Chase, for the defendant, filed a motion for a new trial and a motion in arrest, which motions at a subsequent day were argued together.

[The defendant's counsel insisted that judgment must be arrested for the following reasons, among others: (1) Because the declaration did not set forth a cause of action. It averred that the persons alleged to be fugitive servants "unlawfully went away from the service of the plaintiff at Boone county, in the state of Kentucky, without his consent, and subsequently came to the defendant at Hamilton county, Ohio," and that the defendant harbored and concealed them after notice that they were "fugitives from labor," which averments did not make a case within the constitution and law. (2) Because the verdict, being entered on the third and fourth counts only, did not comprehend all the issues submitted to the jury. (3) Because one of the counts on which the verdict was entered did not conclude against the form of the statute, and was therefore fatally defective. They also insisted that a new trial should be granted for the following, among other, reasons: (1) Because the verdict was against evidence. (2) Because the damages were excessive, being the full amount claimed, whereas the verdict did not comprehend the ninth count, which alone alleged the total loss of the services of Andrew.] 4